IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

MARTHA I. BONILLA-RAMIREZ,

Plaintiff,

v.

MVM, INC., et al.

Defendants.

CIVIL NO. 15-1586 (PAD)

## OPINION AND ORDER

Delgado-Hernández, District Judge.

Plaintiff Martha Bonilla-Ramírez was employed by MVM Security, a contractor of the United States Immigration and Customs Enforcement of the Department of Homeland Security "DHS-ICE"). Following her dismissal, she initiated this action against MVM, MVM's General Counsel Christopher McHale, DHS-ICE, the U.S. Department of Justice and various federal officials, complaining about gender discrimination, retaliatory discharge, defamation, tortious interference with employment contract, and intentional infliction of emotional distress under Federal and Puerto Rico law.[1]

On May 23, 2016, the court dismissed (i) the RICO claims against the Federal Defendants and MMM; and (ii) the claims against McHale (Docket No. 66); on May 25, 2016, it dismissed the Law 80, Law 100 and Law 115 claims against the Federal Defendants (Docket No. 68); and on June 17, 2016, it dismissed the defamation and tortious interference with employment contract claims against them (Docket No. 83). Only the Title VII and state claims against MVM remain.

---

[1] More specifically, under the Racketeer Influence and Corrupt Organization Act, 18 U.S.C. § 1961, *et seq.*; Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000, *et seq.*; Puerto Rico's Unjust Discharge Act, Law 80 of May 30, 1976, P.R. Laws Ann. tit. 29 §§ 185a, *et seq.*; Puerto Rico's general anti-discrimination statute, Law 100 of June 30, 1959, P.R. Laws Ann. tit. 29 §§ 146, *et seq.*; Puerto Rico's general anti-retaliation statute, Law 115 of December 20, 1991, P.R. Laws Ann. tit. 29 §§ 194, *et seq.*; Puerto Rico's general tort statute, Article 1802 of the Puerto Rico Civil Code, P.R. Laws Ann. tit. 31 § 5141; and Article 1803 of the Puerto Rico Civil Code, P.R. Laws Ann. tit. 31 § 5142 (Docket No. 1 at ¶¶ 45-63, and 78-80).

Before the court is MVM's "Motion for Summary Judgment" (Docket No. 71), which plaintiff opposed (Docket No. 86). MVM replied (Docket No. 100).[2] For the reasons explained below, defendant's motion is GRANTED and the case DISMISSED.

## I.      STANDARD OF REVIEW

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). The purpose of summary judgment is "to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." Mesnick v. Gen. Elec. Co., 950 F.2d 816, 822 (1st Cir. 1991)(quoting, Garside v. Osco Drug, Inc., 895 F.2d 46, 50 (1st Cir. 1990)).

A factual dispute is "genuine" if it could be resolved in favor of either party, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986), and "material" if it potentially affects the outcome of the case in light of applicable law. Calero-Cerezo v. U.S. Dep't of Justice, 355 F.3d 6, 19 (1st Cir. 2004). As to issues on which the nonmovant has the burden of proof, the movant need to no more than aver absence of evidence to support the nonmoving party's case. Celotex Corp., 477 U.S. at 325; Mottolo v. Fireman's Fund Ins. Co., 43 F.3d 723, 725 (1st Cir. 1995). All reasonable

---

[2] The parties submitted more than 350 statements of fact (including proposed statements of fact, the corresponding opposing statements, additional statements and reply statements) and over 1,300 pages of supporting documents, some of which are irrelevant for purposes of summary judgment. As such, and although the court reviewed every statement submitted by the parties and the supporting documents, it will only consider and include in this Opinion and Order those facts that are material for purposes of summary judgment as mandated by Fed.R.Civ.P. 56. The court notes its frustration with plaintiff's counsel's failure to cite to properly numbered and labeled exhibits (the references to the exhibits in plaintiff's opposing statement and additional statements of fact do not correspond to any numbering of the exhibits or documents themselves). For example, in some instances plaintiff refers to a document allegedly attached as Exhibit 5, but no document is labeled or filed as Exhibit 5; and the fifth document filed in support of her statements does not correspond to the exhibit either. As such, most – if not all – of plaintiff's exhibits should have been stricken for violating the court's anti-ferret rule, Local Civ.R. 56 (e) as the court does not have an ". . . independent duty to search or consider any part of the record not specifically referenced in the parties' separate statement of facts." At the end of the day, to avoid any confusion when citing to the exhibits, the court has opted to utilize in some instances the page numbering provided by the court's Case Management/Electronic Case Filing System ("CM/ECF").

factual inferences must be drawn in favor of the party against whom summary judgment is sought. Shafmaster v. United States, 707 F.3d 130, 135 (first Cir. 2013). The party moving for summary judgment bears the initial responsibility of demonstrating the absence of a genuine issue of material fact. Celotex Corp., 477 U.S. at 323. Record review shows absence of genuine factual dispute as to the facts identified in the section that follows.

## II.    BACKGROUND

### A. ICE Contract and Standard of Conduct Applicable to Plaintiff.

MVM is a security services firm serving U.S. Government clients including the US Immigration and Customs Enforcement of the Department of Homeland Security ("ICE"). See, Docket No. 71, MVM's "Statement of Uncontested Facts in Support of Motion for Summary Judgment" ("SUMF") at ¶ 1. ICE conducts detention, health, welfare, transportation and deportation of illegal alien detainees and coordinates their final removal from the United States. In Puerto Rico, MVM provides services to ICE pursuant to a Contract ("ICE Contract") at several facilities, including the General Services Administration ("GSA") Center in Guaynabo, which is located in the territory of Fort Buchanan, and the Luis Muñoz Marín International Airport ("LMM Airport"). SUMF at ¶ 2. Employees working under the ICE Contract and other MVM government contracts in Puerto Rico are required to obtain and maintain security clearance by the U.S. Government. SUMF at ¶ 3.[3]

---

[3] In her "Opposing Statement of Facts," plaintiff does not comply with Local Rule 56(c), which requires "[a] party opposing a motion for summary judgment [to] submit with its opposition a separate, *short*, and *concise* statement of material facts. The opposing statement *shall* admit, deny or qualify the facts supporting the motion for summary judgment by reference to each numbered paragraph of the moving party's statement of material facts. Unless a fact is admitted, the opposing statement shall support each denial or qualification by a record citation as required by this rule" (emphasis added). Instead, plaintiff labeled her response to MVM's SUMFs by stating if, in her view, the statement was "contested" or "uncontested," followed by an extensive and unnecessary explanation and argumentation with no record citation or with several record citations that do not properly contradict the SUMF, making the evaluation of the summary judgment record a very challenging task.

<u>Bonilla-Ramírez</u> v. <u>MVM, Inc.</u>, *et al.*
Civil No. 15-1586 (PAD)
Opinion and Order
Page 4

Pursuant to the ICE Contract, MVM must immediately remove an employee from duty if any disqualifying information concerning the employee is received or confirmed by the ICE Contracting Officer Representative ("COR") or the Government. SUMF at ¶ 5.[4]  It provides that ICE may direct MVM to remove any employee who has been disqualified either for security reasons or for being unfit to perform duties as determined by the COR or other ICE representative. Upon such direction, MVM must take action immediately and notify the COR when the employee is removed from duty.  SUMF at ¶ 6.[5]  Elpidio Nuñez-Cordero was Chief of Detention Operations, Department of Homeland Security and COR for the ICE Contract.

**B.  Plaintiff's Employment.**

On March 5, 2007, plaintiff began working for MVM as an on-call Detention Officer ("DO") at the GSA Center.  Sometime between 2011 and 2012, she was assigned to a post at the LMM Airport. SUMF at ¶ 7.  Assigned posts are covered at all times by DO's.  SUMF at ¶ 4.[6] Thus, plaintiff had to comply with the General Post Order applicable to her assigned post at the LMM Airport, which provides that the detention officer cannot "leave the post to which you are assigned until properly relieved or reassigned by the Shift Supervisor or the COR." SUMF ¶ 8.[7]

---

[4] Once more, although plaintiff labeled her response to this statement as "contested" by stating that MVM received disqualifying information against other male employees, they were not terminated.  This contention, however, is not supported by any record citation. As such, the statement is deemed admitted. Moreover, none of the other paragraphs included in plaintiff's response contradicts that the ICE Contract so provides.

[5] Again, plaintiff labeled her response to this statement as "contested" and denied that the contract so requires. Her conclusory statement, however, is not supported by a record citation. To the contrary, part of her extensive explanation in support of her position, admits that the contract so provides. As such, this statement is deemed admitted.

[6] Plaintiff's response with the "contested" label is anything but a short and concise explanation that does not properly controvert this statement.  As such, this statement is deemed admitted.

[7] Plaintiff does not contest this fact, but includes unnecessary and irrelevant information that does not controvert this statement. She also claims that she never abandoned her designated airport post.  As such, this statement is deemed admitted.

To this end, if a DO has to take a break while on duty, he/she has to notify the supervisor. SUMF at ¶ 4.[8]

### C. MVM's and ICE's Standards of Conduct.

According to the MVM Standards of Conduct, which plaintiff received as part of her employment with MVM, the following are examples of inappropriate conduct that "will not be tolerated by MVM" and may result in discipline up to and including immediate termination of employment: (1) abandoning post or leaving post without proper authority (Docket No. 74, Exh. 4, p. 1 at ¶ 13); (2) violation of MVM or client policies, procedures, rules, regulations, or contract requirements, including security regulations (id. at ¶¶ 10 and 20); (3) unauthorized activities on post duty including but not limited to working on personal projects or hobbies (id. at ¶ 22); (4) utilization of personal cellular phones and any other personal communications equipment (id. at ¶ 24); (5) fraternization with MVM employees while on duty (id. at ¶ 25); (6) any other reason deemed by MVM to be contrary to the interests of the company or its clients (id. at ¶ 29). See also, SUMF ¶ 9.[9]

Pursuant to the ICE PR "Minimum Standards of Conduct" and "Removal from Duty" (Docket No. 74, Exh. 4 at pp. 4-6), which plaintiff received as part of her employment with MVM, the following are examples of disqualifying information, which require immediate removal from the ICE Contract: (1) unethical or improper use of official authority or credentials (id. at p. 5 ¶ 14); (2) violation of security procedures or regulations (id. at ¶ 17); (3) misuse of equipment (id. at ¶ 16); and (4) conducting personal affairs during official time (id. at ¶ 10); see also, SUMF at ¶ 10.[10]

---

[8] Plaintiff's response with the "contested" label is anything but a short and concise explanation that does not properly controvert this statement. As such, this statement is deemed admitted.

[9] Plaintiff's "contested" label does not contest this statement.

[10] Plaintiff's "contested" label does not dispute this statement.

### D.  The LMM Airport Badge, Access to Secured Doors and Prohibited Piggyback.

In order to work at the airport, plaintiff had to go through a process to obtain an Airport Identification Badge, which is different from plaintiff's employee badge. SUMF at ¶ 11.  To obtain this ID, DOs, including plaintiff, must fill out an application form and go through the Security Identification Display Area ("SIDA") training which explains the use of the ID and related security issues. The Airport ID application provides that the holder of the ID has to comply with certain federal regulations including 49 C.F.R. §1540. SUMF at ¶ 12.

To access LMM Airport's secured and restricted doors (not open to the general public), an authorized person has to register the Airport ID through a card reader, enter her personal code (chosen by the person), wait for a green light on the reader and then open the door. In order to avoid the entrance of unauthorized persons to sterile areas, only one person, with limited exceptions, should go through the door at a time. Thus, the person has to wait to ensure that the door closes so that the next person goes through the same process. SUMF at ¶ 13.[11]

Everyone who has an Airport ID has to take the SIDA training and comply with the Aerostar rules for accessing sterile doors, which includes a class that advises what they can and cannot do, including piggybacking.[12] SUMF at ¶¶ 14, 16. Piggyback is a serious security violation which places the security of the Airport at risk. SUMF at ¶ 18.[13]  The sterile area in the Airport,

---

[11] Plaintiff's "contested" label does not contradict this statement. Rather, it claims there were not hands-on tutorials, and no demonstrations given to her on how to perform the secure door access process. As with most of her statement, no record citations was provided in support of this contention and in no way her self-serving statement contradicts the process to access secured doors.

[12] "Piggybacking" is a term commonly used in the context of Airport security referring to one person following another through an access point without using his or her own identification card and/or security key/code (unless it is an authorized escort). SUMF at ¶ 17.  As such, it occurs when one employee gains access through an electronically controlled door utilizing his/her Airport ID and security code and allows an unauthorized person, including a person who does not have an ID or someone who has an ID but does not follow the correct process, to access the restricted area with or without the intent for that person to register his/her entry. Id.

[13] Nothing in plaintiff's 2-page long explanation contradicts this statement. In fact, plaintiff's self-serving distinction on when piggyback "is most serious," and contention that other employees have done the same, find no support in the record and do not alter the fact that piggyback is a serious security violation.

which has stricter security measures than other areas, is the area beyond the Transportation

Security Association ("TSA") checkpoint that leads to the gates. SUMF at ¶ 15.

### E.  The June 14, 2014 Events.

On June 14, 2014, plaintiff was assigned to work at MVM's Post at the LMM Airport.

Although the parties disagree as to the exact time when plaintiff began her shift that day, it is

uncontested that she was on her shift during the time relevant to this case (9:00 a.m. to 11:00 a.m.).

SUMF at ¶ 19.[14]  The assigned Supervisor DO was César Méndez.  SUMF at ¶ 20.  DOs had to

report any issues or problems arising during the shift to Méndez. Id.[15]

Early in the morning of June 14, 2014, another DO, Alexandra Rodríguez, called plaintiff

by phone and later met her at the LMM Airport Post.[16] SUMF at ¶ 21.  Rodríguez went in uniform

to the LMM Airport, before going to her work shift at the GSA Center, in order to leave her

boyfriend at the airport. SUMF at ¶ 22.  Rodríguez and plaintiff met with Rodríguez' boyfriend at

the Jet Blue terminal/gate, where his flight was leaving from, and went to have coffee. SUMF at ¶

23.[17] To reach the Jet Blue terminal, plaintiff and Rodríguez went through the LMM Airport's

---

[14] At her deposition, plaintiff explained that she recalled starting a little earlier that day (around 5:00 or 6:00 a.m.) as there was a special line that would be departing earlier with some detainees (Docket No. 68-1 at ¶ 19). But the exact time of when plaintiff began her shift that day is immaterial as it remains uncontested that she was on her shift during the time relevant to this case.

[15] Plaintiff's long explanation labeled as "contested" does not controvert this statement.

[16] As a result of the June 14th incidents, Rodríguez was suspended. She then filed suit against MVM and others in Civil No. 15-1850 (GAG). On March 1, 2017, her case was dismissed by a sister court, which granted MVM's motion for summary judgment, dismissing (i) Rodriguez' Title VII retaliation claims and her claims under PR Law 115, with prejudice, and (ii) her claims under PR Laws 100 and 80 without prejudice. See, Docket No. 93 in Civil No. 15-1850.

[17] The parties strongly contest whether plaintiff obtained permission to leave her post to meet Rodríguez. On the one hand, plaintiff claims that she asked and obtained permission to get a cup of coffee and take a break from her supervisor and that she never left the airport area, which is her designated post. See, Docket No. 86-1 at ¶ 24. Defendant, in turn, claims that plaintiff's contention is belied by (i) her phone records, which reveal that she did not call her supervisor during the period at issue when she was away from her post, either to his cell phone or to the GSA post number; (ii) her supervisor's testimony that he did not authorize plaintiff to leave her post for approximately two (2) hours; and, in any event, (iii) a permission to get coffee does not equal leaving the post for two hours with an off-duty officer to engage in non-work related matters, all while being on the clock and getting paid for that time. See, Docket No. 100 at pp. 9-10.

securities doors and accessed restricted areas, where they were supposed to comply with the established procedure, including the anti-piggybacking rule.

Plaintiff was away from her LMM Airport assigned post with Rodríguez from approximately 9:03 a.m. to 10:44 a.m. During this time, they were together the entire time and accessed several restricted/secured doors. SUMF at ¶ 24.[18] Upon returning to her post, plaintiff learned the supervisor had called and said that the detainees they were expecting around noon were about to arrive. SUMF at ¶ 25. Abraham Ortiz, the other DO covering the LMM Airport Post that day, told plaintiff to hurry, which according to plaintiff, caused her to mess up several times the form she was filling out and prompted her to say to Ortiz: "carajo, me hiciste dañar el documento…" ("hell, you made me mess up the document."). Id.

**F. Post Incident Events.**

Plaintiff informed José Vázquez, Supervisory DO, about the incident with Ortiz who in turn informed Elba Navarro, Assistant Project Manager. SUMF at ¶ 26. Jennifer Morales, the Senior Supervisor Detention Officer, asked plaintiff to put everything in writing, which she did on June 20, 2014. SUMF at ¶ 27. In her written statement, plaintiff did not complain of anything sexual in nature, but as to her discomfort with (i) having Ortiz tell her how to do her job; (ii) Ortiz wanting her to do all the work and admonishing her for using her personal cellphone; (iii) Ortiz asking her to hurry up in order to go pick up some detainees on June 14, 2014, giving her orders and acting like supervisor (Docket No. 71-7). In turn, Ortiz complained of plaintiff's conduct towards him. In particular, on June 18, 2014, he sent a letter to Juan Colón, Project Manager, complaining about plaintiff's use of foul language towards him during the June 14, 2014 incident

---

[18] Plaintiff contests this statement claiming, among others, that she never abandoned her post as her designated post is the airport and she never left the airport.

and specifically about plaintiff telling him: "Vete pa'l carajo" or "go to hell." SUMF at ¶ 28; see also, Docket No. 74-2, Exh. D at p. 36.[19]

In response to these complaints, on June 24, 2014, Navarro, Colón and Morales met with plaintiff and Ortiz to discuss the issues that had arisen between them. SUMF at ¶ 29.  At the meeting, plaintiff complained, among other things, about Ortiz always giving her orders, as if he was a supervisor; about Ortiz using foul language; transporting a detainee by himself; refusing to take a detainee to the gate; leaving his post to take or meet family members at the gate. SUMF at ¶ 30.  Ortiz, on the other hand, stated that plaintiff was always talking and texting on the phone and that on June 14, 2014, she abandoned her post with Rodríguez, who was in uniform but off-duty, for approximately two hours.  SUMF at ¶ 31.[20]  Navarro wrote a report to document the events and discussion at the meeting to see if any corrective action had to be taken. SUMF at ¶ 32; see also, Docket No. 74-2, Exh. E at p. 37.

### G. Corroboration.

Plaintiff did not provide any specific date, which would have allowed MVM to corroborate the information regarding allegations that Ortiz had left the LMM Airport Post to meet or take family members to the gate.  SUMF at ¶ 33.  MVM did, however, corroborate that Ortiz had once escorted a detainee by himself and on a separate occasion had refused to take a detainee to the departing area.  Id.  As to the information provided by Ortiz regarding plaintiff, MVM corroborated that, she had left her post for approximately two hours with Rodríguez on June 14, 2014 while

---

[19] Plaintiff does not contest that Ortíz sent the letter, but denies telling him "to 'go to hell' (although he probably deserved it)." Docket No. 86-1 at ¶ 28.

[20] While plaintiff categorized Ortiz' statements as "fabricate[d] accusations," MVM's investigation confirmed the June 14, 2014 incident, as discussed in detail below.

Case 3:15-cv-01586-PAD    Document 136    Filed 03/30/17    Page 10 of 35

Bonilla-Ramírez v. MVM, Inc., et al.
Civil No. 15-1586 (PAD)
Opinion and Order
Page 10

Rodríguez was off-duty. SUMF at ¶ 34.[21]  Moreover, MVM found out, through LMM Airport security videos, that plaintiff had engaged in the practice of piggybacking with Rodríguez. Rodríguez was the first one going through the door.  Rodríguez swiped her card and entered her security code.  Plaintiff swiped her card but did not enter her security code and did not wait for the door to close behind Rodríguez prior to accessing it. SUMF at ¶ 35.[22]

### H.  Consequences.

Upon evaluation of the information, Christopher McHale, MVM Vice President and General Counsel, determined to give verbal counseling to plaintiff and Ortiz for the corroborated offenses. SUMF at ¶ 38.  On July 2, 2014, Rodriguez was given a disciplinary action for accessing LMM Airport secured doors on June 14, 2014, while off-duty, and engaging in piggyback. The disciplinary action included a suspension from work and the removal of her Airport ID. The decision to suspend Rodriguez was based on her past disciplinary history, which included three disciplinary actions in the last year and a prior suspension related to one of those actions. SUMF at ¶ 39.

On July 10, 2014, plaintiff was given a disciplinary action, including a verbal counseling, for leaving her post for approximately two hours, using her cell phone during work hours and engaging in piggybacking, and the removal of her Airport ID. SUMF at ¶ 40.  On July 28, 2014,

---

[21] As to plaintiff's position pertaining to this matter, see discussion in footnote 16.

[22] As part of the summary judgment record, MVM submitted – and the court examined – a copy of the airport's security videos for June 14, 2014 (and images in PDF captured from those videos), which confirm that plaintiff and Rodríguez passed through secured doors without following the required procedure.  Plaintiff does not question the video, but disputes having engaged in any misconduct as, in her view, the incident recorded is not a security violation.  In the video, she appears using her cell phone. SUMF at ¶ 36.  In response to this statement, plaintiff clarified that she was not "using" her cellphone, but "reading" her supervisor's text message (Docket No. 86-1 at p. 25).  It remains uncontested, however, that plaintiff had her phone with her, the general rule is that plaintiff could not have her personal phone at the LMM Airport facilities, and that she could only use her personal cell phone at the LMM Airport when the supervisors asked or permitted it for work purposes or for personal emergencies only. SUMG at ¶ 37.  That said prohibition only applied to the San Patricio facility – as plaintiff conveniently argued – finds no support in the record. In fact, the court reiterates its frustration with plaintiff's attorney's repeated practice of referring the court's attention to portions of deposition transcripts that do not support plaintiff's contentions.

Ortiz was given a verbal counsel/oral warning for making a movement of a female detainee by himself and for refusing to take a detainee to the departing area. SUMF at ¶ 41.  Plaintiff's and Rodríguez's Airport IDs were removed because of the security violations and misuse of their Airport IDs. SUMF at ¶ 42. In consequence, plaintiff could no longer work at the Airport because she needed the Airport ID to work there, and returned to the GSA Center as an on-call officer. Id.[23]

## I.   COR and ICE investigation.

In compliance with ICE Contract requirements, MVM informed Elpidio Nuñez-Cordero Chief of Detention Operations, Department of Homeland Security and COR for the ICE Contract, of security violations committed by plaintiff, Rodriguez and another detention officer named David Santiago in two separate incidents at the LMM Airport. SUMF at ¶ 46.  Regarding the June 14, 2014 incident, Nuñez, along with Colón, MVM Project Manager, went to the LMM Airport and viewed the Closed Circuit Television security camera recordings from the LMM Airport for June 14, 2014 showing both plaintiff and Rodríguez engaging in piggybacking. SUMF at ¶ 47.[24]

On June 26, 2014, Nuñez wrote a letter to Javier Erazo-Vélez, AOCC Operations/Security Control Systems Lead, Aerostar Airport Holding LLC, LMM Airport, to request a copy of the video recording of June 14, 2014 showing plaintiff and Rodríguez piggybacking and the Continuum Access Event Logs on both of them for the relevant time period on June 14, 2014. The

---

[23] Although plaintiff claims –without any record support – that Aerostar never removed her airport ID, the summary judgment record confirms that (i) as part of the corrective actions listed in MVM Form 700-5, Plaintiff's Employee Improvement Notice – which plaintiff signed – her Aerostar badge was going to be removed (Docket No. 86-9 at p. 1 "Summary of Corrective action to be taken," Section); (ii) in her deposition, plaintiff herself admitted that her badge was taken (Docket No. 71-3, Plaintiff's Depo. at 157, 159-160); and (iii) a copy of an e-mail from Elpidio Nuñez with an exhibit containing acknowledgement receipt of plaintiff's, Santiago's and Rodríguez's Aerostar Badge was also attached to MVM's motion for summary judgment.  Therefore, plaintiff's contentions are simply false.

[24] Plaintiff "contested" this statement asserting that MVM did not obtain the video of June 14, 2014 from Aerostar (Docket No. 86-1 at p. 35).  In support, she refers the court's attention to MVM's Answer to Plaintiff's Request for Production, Response No. 10. Once more, the problem with this response is that it serves to confirm MVM's SUMF 49 and not plaintiff's contested version of it. As such, the statement is deemed admitted.

Continuum Access Event Log shows the access through secured doors using Airport credentials. SUMF at ¶ 48.  The video obtained from Aerostar has two clips, one starting at approximately 8:59:55 a.m. and ending at approximately 9:05:00 a.m. SUMF at ¶ 49.[25]

On June 30, 2014, Nuñez wrote an email to his first line supervisor, Mr. Jesús Cruz, with a copy to several ICE and MVM employees, stating his position that the offenses committed by plaintiff, Rodríguez, and Santiago are disqualifying information requiring immediate removal of the employees from performing duties under the ICE Contract. SUMF at ¶ 53.  The same day, Colón, one of the managers copied in the email, responded that the employees who committed the offenses had been referred to MVM Human Resources and that they made the decision regarding discipline. SUMF at ¶ 54. Similarly, Nuñez requested that MVM inform what decision it made regarding these three employees.  Id.

On July 23, 2014, Nuñez escalated the matter through his chain of command to determine what action to take.  SUMF at ¶ 55. Accordingly, on August 4, 2014, he sent an email to Camilo Cuellar, ICE Management & Program Analyst, detailing the two security incidents at LMM Airport involving plaintiff, Rodríguez, and Santiago and recommending that these employees be permanently removed from performing duties on the ICE Contract, based on the seriousness and nature (security) of the violations. SUMF at ¶ 56. Cuellar wrote an email to MVM Operations Manager, Jay Vergel, to request additional information regarding the incidents. SUMF at ¶ 57.  On

---

[25] This clip shows Rodríguez and plaintiff going through Airport secured door C2090 at approximately 9:03:18 a.m. to 9:03:29 a.m. The second clip starts at approximately 10:34:55 a.m. and ends at approximately 10:39:59 a.m. It shows Rodríguez and plaintiff going through Airport secured door C2090 at approximately 10:38:26 a.m. to 10:38:33 a.m. The first video clip shows Rodríguez swiping her card and entering her personal access code and plaintiff following her without complying with established procedure (as she swipes her card but does not enter her personal access code nor wait for the door to close before accessing the door). The second video shows both Rodríguez and plaintiff accessing the same door one after the other, without following the appropriate procedure of waiting for the door to close before the other one enters her credentials in order to access the door. SUMF at ¶ 49. As previously explained, a copy of the video was submitted – and examined by the court – as part of the summary judgment record. From what Nuñez saw in those videos and confirmed with the "Continuum Access Event Logs" for plaintiff and Rodríguez as to June 14, 2014, he confirmed that from 9:00 a.m. and 10:40 a.m., Rodríguez and plaintiff accessed several secured doors of the sterile area of the LMM Airport in violation the established procedure. SUMF at ¶¶ 50-52.

August 5, 2014, Vergel confirmed the violations and stated that disciplinary action had been taken.

Id.

Upon consideration of all the facts, Cuellar concluded that the offenses committed by plaintiff, Rodríguez, and Santiago, disqualified them from performing work under the Contract between MVM and ICE. SUMF at ¶ 58.[26]  After various emails between Cuellar and Vergel, on August 12, 2014, Cuellar sent an email to Vergel with a copy to Christopher McHale requesting that plaintiff, Rodríguez, and Santiago be removed from the Contract immediately, after the incidents were confirmed through the review of evidence and they were deemed unfit for duty under Section 1.15.5 of ICE Contract. Id.

Following receipt of the order of removal and the removal of plaintiff's security clearance, McHale decided to terminate plaintiff's, Santiago's and Rodriguez' employment with MVM, based on the Government's instructions and the ICE Contract. SUMF at ¶ 61. The instruction for removal was given to local management that same day. In particular, at 5:10 p.m. on August 12, 2014, Vergel forwarded Cuellar's email to Colón (copying McHale) with an instruction to read the email "…and make sure these employees are removed from post today. I will call you as well to discuss." (Docket No. 74-2, Exh. K at p. 1).

On August 12, 2014, Jennifer Morales, Senior Supervisor DO, called plaintiff and asked her to report to work the following day at the time of her shift. SUMF at ¶ 64. Plaintiff reported to work on August 14, 2014 and she was informed of the termination, effective August 13, 2014. Id.;

---

[26] The summary judgment record shows that, before receiving a final determination from ICE, J. Vergel (MVM) informed Cuellar (ICE) on August 5, 2014, that MVM had investigated these incidents and confirmed that the facts as stated by Nuñez were accurate. As such, MVM took disciplinary actions against them "in accordance with their respective union" (Docket No. 74-7 at p. 5). He acknowledged, however, that "[i]f the government feels that these employees are not capable of working on the contract, the government is well within its rights to so instruct MVM and we will take action to comply." Id.

see also, Exhibit 1, Plaintiff's Depo. at 160-162, 229-230 and Exhibit 14, Plaintiff's Termination

Letter. Rodríguez and Santiago were also terminated effective August 13, 2014. SUMF at ¶ 65.

On August 12, 2014, plaintiff filed a charge of discrimination and retaliation against MVM,

with the EEOC. See, Docket No. 86-1, "Plaintiff's Statement of Additional Facts" ("PSAF") at ¶¶

99-100.[27]    Although the parties attribute a different legal significance to this matter, it is

uncontested that plaintiff's EEOC Charge was faxed to a MVM fax on August 12, 2014. PSAF at

¶ 101, Docket No. 86-3 at p. 12, and Docket No. 100-1 at ¶ 101.  The fax was addressed to Ms.

Amanda Traeto, who allegedly was MVM's "Human Resources Coordinator," not to McHale.

Docket No. 86-3 at p. 12.[28]

### J.  Other Facts.

MVM has in place a sexual harassment policy which prohibits sexual harassment and

provides a process to report and address any complaint of sexual harassment.  SUMF at ¶ 72.

Plaintiff received a copy of the policy.  Id.

### III.    DISCUSSION

### A.  Sex Discrimination under Title VII.

Plaintiff alleges that MMM subjected her to disparate treatment because of her gender in

violation of Title VII (Docket No. 1 at p. 1; Docket No. 86 at p. 9).  Title VII provides that it is

unlawful for an employer "discharge any individual ... because of such individual's race, color,

religion, sex, or national origin." 42 U.S.C. § 2000e-2.  She has not presented direct evidence of

discrimination.  However, a plaintiff may demonstrate discrimination under Title VII availing

---

[27] On August 15, 2014, plaintiff filed another charge (No. 515-2014-0479) claiming that she was terminated in retaliation for filing her August 12, 2014 Charge.

[28] It is unclear from the record who Ms. Traeto is or if she works for MVM. But it is uncontested that plaintiff has not identified or announced her as a witness.

herself of the burden-shifting framework articulated in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), and/or by relying on the mixed-motives theory of discrimination initially announced in Price Waterhouse v. Hopkins, 490 U.S. 228 (1989)(plurality opinion) and subsequently codified by the Civil Rights Act of 1991 at 42 U.S.C. § 2000e-2(m). See, Burns v. Johnson, 829 F.3d 1, 8-9 & n.9 (1st Cir. 2016) (explaining methods of proof). Under both approaches, plaintiff must present enough evidence to permit a finding that there was differential treatment in connection with an adverse employment action, and that the challenged decision was caused at least in part by a forbidden type of bias. Id.

As to McDonnell Douglas, plaintiff must first establish a *prima facie* case by showing that: (1) she belonged to a protected class; (2) she performed her job satisfactorily; (3) her employer took an adverse employment decision against her; and (4) her employer continued to have her duties performed by a comparably qualified person. Burns, 829 F.3d at 9 & n.8. If the plaintiff succeeds in establishing a *prima facie* case, the presumption arises that the employer unlawfully discriminated against plaintiff, shifting to the employer the burden of articulating a legitimate, nondiscriminatory reason for the adverse employment action. Benoit v. Technical Mfg. Corp., 331 F.3d 166, 174 (1st Cir. 2003); Champagne v. Servistar Corp., 138 F.3d 7, 12 (1st Cir. 1998).

If the defendant is successful in satisfying its burden, plaintiff no longer can rest on the initial inference of discrimination. Bennett v. Saint-Gobain Corp., 507 F.3d 23, 31 (1st Cir. 2007). The inference raised by the *prima facie* case dissolves, and the last transfer of burdens occurs. Mesnick v. General Electric, 950 F.2d 816, 823 (1st Cir. 1991), cert. denied 504 U.S. 985 (1992). In that case, the burden shifts back to the plaintiff to show that the reason proffered was a pretext concealing unlawful discrimination of the type alleged. Rodríguez-Cuervos v. Wal-Mart Stores, Inc., 181 F.3d 15, 19 (1st Cir. 1999); Mesnick, 950 F.2d at 823.

At this stage, the plaintiff's burden of producing evidence to rebut the employer's stated reason for its employment action merges with the ultimate burden of persuading the court that she has been the victim of intentional discrimination. Feliciano de la Cruz v. El Conquistador Resort and Country Club, 218 F.3d 1, 6 (1st Cir. 2000); Vélez v. Thermo King de Puerto Rico, Inc., 585 F.3d 441, 447 (1st Cir. 2009). The ultimate question is not whether the employer's explanation was false, but whether discrimination was the cause of the adverse employment action. Zapata-Matos v. Reckitt & Coleman, Inc., 277 F.3d 40, 45 (1st Cir. 2002).

The mixed-motives framework applies in cases where multiple motives lie behind an adverse employment action. Burns, 829 F.3d at 9 & n.9. It allows a plaintiff to establish an unlawful employment practice by demonstrating that sex was a motivating factor for any employment practice, even though other factors also motivated the practice. Id. (quoting, 42 U.S.C. § 2000e–2(m)). Once a plaintiff shows the existence of an impermissible motivating factor, the employer has a limited affirmative defense that does not absolve it of liability, but restricts the remedies available to a plaintiff. Id. (quoting, Desert Palace v. Costa, 539 U.S. 90, 94 (2003)).

First, MVM focuses on the McDonnell Douglas test (Docket No. 72 at pp. 27-28); plaintiff does not argue that any other test applies; and the record does not evince multiple motives. Because a court may not consider the employer's alleged nondiscriminatory reason for taking an adverse employment action when analyzing the *prima facie* case, Vélez, 585 F.3d at 448, the court assumes for purposes of summary judgment that plaintiff has successfully established a *prima facie* case of sex discrimination under McDonnell Douglas.

Second, MVM asserts that plaintiff infringed MVM's and ICE's Standards of Conduct and rules regarding security (Docket No. 72 at p. 28). Plaintiff incurred in a series of violations while performing her duties as a DO, including abandoning her post for approximately two hours to

fraternize with an off-duty DO; using her personal cellular phone while on duty; and engaging in the serious security violation of piggybacking through airport security doors, all in violation of MVM's and ICE's Standards of Conduct, which plaintiff received and signed.  Further, ICE requested her removal from the Contract, making her unfit for duty under the terms of the Contract. These are legitimate, nondiscriminatory grounds for the employer's actions.  See, Vélez, 585 F.3d 441, 448 (1st Cir. 2009)(violating company's code of conduct considered legitimate, non-discriminatory reasons for termination of plaintiff's employment); Hughes v. Bedsole, 48 F.3d 1376, 1384 (4th Cir. 1995)(security violations recognized as nondiscriminatory reason for discharge); Rodríguez-Candelario v. MVM Security, 2017 WL 807645, *14 (D.P.R. March 1, 2017)(security violations including piggybacking, and termination at ICE's request considered nondiscriminatory reason for adverse employment actions taken against plaintiff).[29]  And plaintiff has not factually rebutted them.[30]

Third, pretext analysis is more demanding than the assessment of whether a *prima facie* case has been established, moving the inquiry to a new level of specificity.  Mariani-Colón v. Department of Homeland Security ex rel. Chertoff, 511 F.3d 216, 222 (1st Cir. 2007); Kosereis v. Rhode Island, 331 F.3d 207, 213 (1st Cir. 2003).  A plaintiff must produce evidence that the employer did more than get it wrong.  She must elucidate specific facts which would enable a jury to find that the reason given for the employer's action is a lie intended to cover up the employer's real motive: plaintiff's sex.  Meléndez v. Autogermana, Inc., 622 F.3d 46, 52 (1st Cir. 2010);

---

[29]  See also, Finley v. Florida, 2013 WL 4710404, * 9 (E. D. La. Aug. 30, 2013)(considering security violation as a legitimate, nondiscriminatory reason for termination of plaintiff's employment); Drumm v. Morningstar, Inc., 2009 WL 2612311, *5 (N.D. Cal. Aug. 24, 2009)(dismissing discrimination claim of plaintiff discharged after clients requested that employer remove him from their accounts); De Arteaga v. Pall Ultrafine Filtration Corp., 862 F.2d 940, 942 (1st Cir. 1988)(customer dissatisfaction deemed valid grounds for termination).

[30]  Rebutting a proffered legitimate reason for the adverse action is more demanding that the relatively low bar at the *prima facie* phase of the burden-shifting framework. See, Martínez-Burgos v. Guayama Corp., 656 F.3d 7, 14 (1st Cir. 2011)(so acknowledging).

Morgan v. Massachusetts General Hosp., 901 F.2d 186, 191 (1st Cir. 1990).  To that end, plaintiff can demonstrate pretext by producing evidence that she was treated differently from similarly situated employees.  See, Windross v. Barton Protective Services, Inc., 586 F.3d 98, 104 (1st Cir. 2009)(holding that plaintiff shows pretext by demonstrating similarly situated employees outside of his protected class were treated differently); McDonnell Douglas, 411 U.S. at 804 (recognizing that "especially relevant" to a showing of pretext is whether the defendant treated others outside of the protected group in comparable situations like it treated plaintiff); Kosereis, 331 F.3d at 214 (pretext in disparate treatment of similarly situated employees).

In such instance, plaintiff bears the burden of showing that the individuals with whom she seeks to be compared "have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it."  Rodríguez-Cuervos, 181 F.3d at 21.  And therefore, the test is whether a prudent person, looking objectively at the incidents, would think them roughly equivalent and the protagonists similarly situated.  The comparison cases "need not be perfect replicas," but they must "closely resemble one another in respect to relevant facts and circumstances." Conward v. Cambridge Sch. Comm., 171 F.3d 12, 20 (1st Cir.1999).

Plaintiff alleges that some male employees were treated differently that her, to wit: Ortiz, Juan Hernández and Reinaldo Cruz (Docket No. 86 at pp. 3-4, 9).  As to Ortiz, she contends that MVM only took disciplinary actions exclusively against her, while Ortiz committed the same violations but went unpunished.[31]  With respect Hernández and Cruz, she claims they were involved in a safety violation; an "incident where a vehicle blocked one of the Airport's gates,"

---

[31] In support of this statement, plaintiff refers the court's attention to an Exhibit IV.  But there is no Exhibit IV, or a document marked/labeled as such.  The only document pertaining to Ortiz' alleged violations of company policies is MVM Form 700-5 dated 6/22/14, filed at Docket No. 86-8. And contrary to plaintiff's contention, the violations committed by Ortiz (that he escorted a detainee by himself and refused to take a detainee to the departing area) are not the same.

but were not terminated from employment.  Id. at pp. 3-4, 9-10.  In connection with piggybacking, she suggests the violation she committed was not serious enough to warrant termination (Docket No. 86-1 at p. 12).

That plaintiff may think that what she did was not serious enough for termination, does not mean that she did not commit the violation or that the violation was not serious.  See, Shorette v. Rite Aid of Maine, Inc., 155 F.3d 8, 15 (1st Cir. 1998)(plaintiff's personal opinion regarding her own work performance or qualifications is irrelevant).  Regardless of plaintiff's *opinion* that the offenses committed by the other three individuals are more serious, the violations are different in character.  They were considered operational violations by MVM, not a security violation like the one attributed to her.  Likewise, the person in charge of overseeing compliance with the ICE Contract explained that the operational violations did not require removal from the ICE Contract. The other employee who engaged in piggybacking (Rodríguez) and another male DO (Santiago) who engaged in a security violation, were, like plaintiff, terminated, upon ICE's removal order and in compliance with contract obligations.  And there is no evidence that ICE requested removal from the ICE Contract of any other employee that MMM did not in turn terminate.[32]

From this perspective, plaintiff has not identified one single, similarly situated person that was treated differently to the point of showing pretext to discriminate against her because of her gender.  See, Pina v. Children's Place, 740 F.3d 785, 798 (1st Cir. 2014)(no pretext due to absence of evidence that defendant treated other employees similarly situated in a different manner); Woodward, 714 F.3d at 640 (". . .Woodward occupied a unique position within Emulex, as the only employee working from a remote office… This arrangement likely entailed specific

---

[32] That a male employee was terminated at the same time, and for the same reason, militates against an inference of gender based discrimination, particularly because there is no other evidence that would tend to establish said discriminatory animus.

Bonilla-Ramírez v. MVM, Inc., et al.
Civil No. 15-1586 (PAD)
Opinion and Order
Page 20

administrative costs.  Given this context, the fact that other employees experienced declines in revenue similar to Woodward's falls far short of the showing necessary to establish that they were similarly situated to him for purposes of the pretext inquiry"); Conward, 171 F.3d at 16 ("No valid comparison can be drawn between two incidents for the purpose of proving disparate treatment if 'differentiating or mitigating circumstances' distinguish either the employee's conduct or the employer's response to it").[33]  Therefore, the disparate treatment claim under Title VII must be dismissed.

### B.  Hostile Work Environment under Title VII.

Plaintiff alleges to have been subjected to a hostile work environment because of her sex (Docket No. 1 at pp. 1, 15).  Hostile work environment is a form of unlawful discrimination prohibited by Title VII.  Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 106 (1986).  Title VII requires an individual who claims to have suffered discrimination or retaliation to file an administrative charge with the Equal Employment Opportunity Commission (EEOC) prior to commencing a civil action.  See 42 U.S.C. § 2000e–5(b), (e)(1), (f)(1); Morales-Cruz v. University of Puerto Rico, 676 F.3d 220, 223 (1st Cir.  2012).

First, MVM alleges the claim is barred for failure to exhaust administrative remedies (Docket No. 72 at p. 21).  Plaintiff filed an EEOC Charge on August 12, 2014 (Docket No. 1-5 at p. 4 with copy of the EEOC Charge).  The Charge alleges sex discrimination and retaliation for the period between June 24, 2014 and August 12, 2014.  Id.  While the complaint refers to acts allegedly committed by Ortiz prior to June 24, 2014 – see, Docket No. 1 at ¶ 20, stating that plaintiff began to experience a hostile work environment due to Ortiz' verbal and physical

---

[33] See also, Cardona Jiménez v. Bancomercio, 174 F.3d 36, 42 (1st Cir. 1999)(concluding that plaintiff's and comparator's roles were not sufficiently equivalent to justify a finding of pretext); Ray, 799 F.3d at 114-115 (analyzing insufficiency of evidence presented to establish differential treatment in connection with pretext); Straughn, 250 F.3d at 37-38 (same).

misconduct in 2013, and ¶ 21, referring to an incident in March and/or April 2014 where Ortiz allegedly yelled at the plaintiff in front of detainees – the EEOC Charge makes no mention of a hostile work environment based on alleged sexual harassment by Ortiz. Similarly, the Charge refers to events starting on June 24, 2014. But it makes no mention of events prior to plaintiff's removal from her post.[34] Thus, plaintiff is barred from pursuing a hostile work environment action based on allegations of sexual harassment or hostile work environment not properly raised in the EEOC Charge.

Second, even if plaintiff were not barred from pursuing the action, the evidence is insufficient to sustain the claim. A hostile work environment exists when the complained-of conduct is severe or pervasive enough to alter the conditions of plaintiff's employment and create an abusive work environment. The conduct must be both objectively and subjectively offensive, such that a reasonable person would find it abusive, and the plaintiff in fact perceived it to be so. Additionally, it must be based on plaintiff's statutorily protected characteristics. Ponte v. Steelcase, Inc., 741 F.3d 310, 319-320 (1st Cir. 2014); Rivera v. Puerto Rico Aqueducts and Sewers Authority, 331 F.3d 183, 188 (1st Cir. 2003).

Hostile work environment claims typically involve repeated conduct. They are bred from an ongoing series of harassing incidents. Noviello v. City of Boston, 398 F.3d 76, 84 (1st Cir. 2005). A single act of harassment may not be actionable on its own. Johnson, 714 F.3d at 53. The point at which a work environment becomes abusive does not depend on any "mathematically precise test." Oncale v. Sundowner Offshore, 523 U.S. 75, 81 (1998). To determine whether a reasonable person would so find the environment, a court must look at the totality of circumstances, including the severity and frequency of the conduct; whether it was physically

---

[34] And, it is uncontested that after June 24, 2014, plaintiff was not assigned to work with Ortiz.

threatening or humiliating or a mere offensive utterance; and whether it unreasonably interfered with the employee's work performance.  Carmona-Rivera v. Puerto Rico, 464 F.3d 14, 19 (1st Cir. 2006); Ponte, 741 F.3d at 319-320.  None of these factors is individually determinative of the inquiry.  Ayala-Sepúlveda v. Municipality of San Germán, 671 F.3d 24, 31 (1st Cir. 2012).

Plaintiff states she was subjected to a hostile work environment created by Ortiz (Docket No. 1 at p. 15).  She complained to the employer that Ortiz asked her to hurry up filling out some documents because there were some detainees about to arrive; Ortiz said that CBP's stand there without doing anything; Ortiz gave her work related orders; Ortiz called her out for using her cellular phone; Ortiz escorted a female detainee by himself on one occasion; and Ortiz refused to do an escort, which had to be done by a supervisor (Docket No. 100 at p. 17).

Lack of professionalism and common courtesy are insufficient to configure a hostile or abusive work environment.  See, Lee-Crespo v. Schering-Plough, 231 F.Supp.2d 420, 429-430 (D.P.R. 2002), aff'd 354 F.3d 34, 46-47 (1st Cir. 2003)(so holding).  And to a significant extent, what plaintiff complains of is that she was being picked on by Ortiz because he was bossy.  But personality conflicts do not make up an actionable hostile work environment.  See, Vore v. Indiana Bell Telephone Co., Inc., 32 F.3d 1161, 1162 (7th Cir. 1994)(pointing out that "personality conflicts between employees are not the business of the federal courts"); Divers v. Metropolitan Jewish Health Systems, 2009 WL 103703, *18 (E.D.N.Y. Jan. 14, 2009)(dismissing hostile environment claim in part because discord resulted from personality conflicts).

Plaintiff asserts that Ortiz: put his foot in the way of plaintiff while escorting detainees; forced plaintiff to walk in front of detainees; would take the Company's equipment, leaving her with no communication; would make disgusting jokes about women with detainees; and on one occasion, when Ortiz opened a file cabinet in a space with little room, his chair banged against her

which made her bump forward against a desk.  Id. at p. 19.  The record does not, however, specify when these alleged acts happened or how often, albeit from plaintiff's statement of June 30, 2014, the equipment incident only happened once.  Likewise, there is no detail as to the jokes that Ortiz would make.  These generalities and vagueness are fatal.  They lack the "sex" component and the severe and pervasiveness required to survive as a viable claim, and for the same reason, are insufficient to show a hostile work environment because of sex.  See, Lee-Crespo, 231 F.Supp.2d at 429 (summary judgment dismissing sexual harassment action because plaintiff failed to establish that her workplace was permeated with discriminatory intimidation, ridicule, and insult sufficiently severe or pervasive to alter the conditions of her employment and create an abusive work environment).

At any rate, employer liability depends on whether the objectionable environment is caused by plaintiff's supervisor or by a co-employee.  Crowley v. L.L. Bean, Inc., 303 F.3d 387, 401 (1st Cir. 2002); Rosado v. American Airlines, 743 F.Supp.2d 40, 58 (D.P.R. 2010).  If caused by a supervisor, the employer is liable unless (1) the employer has exercised reasonable care to prevent and correct any harassing behavior; (2) plaintiff unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to otherwise avoid harm; and (3) the harassment has not culminated in a tangible employment action.  Faragher v. City of Boca Ratón, 524 U.S. 775, 807 (1998); Burlington Industries, Inc. v. Ellerth, 524 U.S. 742, 765 (1998).

When coworkers are responsible for the creation of a hostile work environment, an employer can only be liable if the harassment is causally connected to some negligence on the employer's part.  White v. New Hampshire Dept. of Corrections, 221 F.3d 254, 261 (1st Cir. 2000); Noviello, 398 F.3d at 95.  Typically, this involves a showing that the employer knew or should

have known of the harassment and failed to implement prompt and appropriate correction action to stop it.  Noviello, 398 F.3d at 95.

Appropriate corrective action is action reasonably calculated to halt the harassment. Álvarez v. Des Moines Bolt Supply, Inc., 626 F.3d 410, 421 (8th Cir. 2010); Andreoli v. Gates, 482 F.3d 641, 644 (3d Cir. 2007); Duncan v. Manager, Dept. of Safety, City and County of Denver, 397 F.3d 1300, 1310 (10th Cir. 2005).  Its reasonableness depends on elements such as whether the employer investigated the complaint; the promptness with which it did so; if a remedial measure was undertaken; and the effectiveness of the measure.  See, Turnbull v. Topeka State Hosp., 255 F.3d 1238, 1244-1245 (10th Cir. 2001)(identifying criteria against which reasonableness may be assessed); Álvarez, 626 F.3d at 421 (same); Andreoli, 482 F.3d at 644 (same).

As stated above, plaintiff complains of Ortiz.  He was her co-worker, not her supervisor. And there is no evidence that MVM negligently ignored a sexually charged hostile work environment such as plaintiff claims existed.  It had adopted a sexual harassment policy with a procedure to report and address any sexual harassment complaint.  Plaintiff received a copy of the policy, and admitted in her June 20, 2014 writing that she had never before complained about Ortiz.  When she did complain and put her complaint in writing, she did not complain of anything that could have reasonably led MVM to conclude that she was complaining of arguably prohibited conduct.  And after June 24, 2014, she was no longer working with Ortiz.  Under these circumstances, the hostile work environment claim must be dismissed.

### C.  Retaliation under Title VII.

Plaintiff contends that her employment was terminated, effective August 13, 2014, in retaliation for the EEOC Charge she filed on August 12, 2014 (Docket No. 1 at pp. 1, 11-12;

Docket No. 86 at pp. 1-2).  Title VII bars employers from retaliating against an employee because she "has opposed any practice made an unlawful employment practice by this subchapter, or because she has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e–3(a); Univ. of Texas v. Nassar, ---U.S.----, 133 S.Ct. 2517, 2523 (2013); Maldonado-González v. Puerto Rico Police, 110 F.Supp.3d 345, 353 (D.P.R. 2015).

At its core, retaliation may be viewed as a modality of vengeance on account of a prior event, to punish someone because of it.  In the absence of direct evidence, courts evaluate retaliation claims under the burden-shifting framework drawn from McDonnell Douglas.  In line with this framework, plaintiff must show that: (1) she engaged in protected conduct; (2) experienced an adverse employment action; and (3) a causal connection exists between the protected conduct and the adverse employment action.  See, Planadeball v. Wyndham Vacation Resorts, Inc., 793 F.3d. 169, 175 (1st Cir. 2015); Kelley v. Correctional Medical Services, Inc., 707 F.3d 108, 115 (1st Cir. 2013).

If the plaintiff establishes a *prima facie* case, the burden shifts to the defendant to articulate a legitimate, non-retaliatory reason for the employment decision.  Collazo-Rosado v. University of Puerto Rico, 765 F.3d 86, 92 (1st Cir. 2014); Garayalde-Rijos v. Municipality of Carolina, 747 F.3d 15, 24 (1st Cir. 2014); Planadeball, 793 F.3d at 175; Kelley, 707 F.3d at 115.  Should the defendant meet this burden, the plaintiff must show that the defendant's stated reason was a pretext to retaliate against her for having engaged in protected activity.  Kelley, 707 F.3d at 115.  The burden of proving retaliation rests with the plaintiff at all times.

Plaintiff focuses on two events: (i) her internal complaint regarding co-worker Ortiz and (ii) the Charge filed with the EEOC on August 12, 2014.  The internal complaint concentrates on

personal issues between plaintiff and Ortiz.  It does not refer to anything sexual in nature.  Instead, it expresses discomfort with (i) having Ortiz tell plaintiff how to do her job; (ii) Ortiz wanting plaintiff to do all the work and admonishing her for using her personal cellphone; (iii) Ortiz asking plaintiff to hurry up in order to go pick up some detainees on June 14, 2014, giving her orders and acting like her supervisor.  As such, it cannot be considered protected activity under Title VII.  See, Fantini v. Salem State College, 557 F.3d 22, 32 (1st Cir. 2009)(explaining that protected activity refers to "action taken to protest or oppose statutorily prohibited discrimination."); Vázquez v. Walker, 2016 WL 7442648, *1 (D.P.R. December 27, 2016)(same).

By contrast, plaintiff engaged in protected activity by filing the EEOC Charge on August 12, 2014, and she suffered an adverse employment action when MVM terminated her employment. The analysis does not end here, as plaintiff must establish the existence of a causal nexus between the protected activity and the adverse employment action, such that a rational factfinder could conclude that one was the result of the other.  Santiago-Ramos v. Centennial P.R. Wireless Corp., 217 F.3d 46, 57 (1st Cir. 2000).  To do so, she must show that the employer acted because she engaged in a protected activity. See, Univ. of Texas, 133 S.Ct. at 2523.

While temporal proximity may suggest retaliation, it is not enough to sustain a reasonable inference of the but-for causation required to prevail in a retaliation action.  See, Carrero-Ojeda v. Autoridad de Energia Eléctrica, 755 F.3d 711, 720 (1st Cir. 2014)(noting that while temporal proximity is one factor from which an employer's bad motive can be inferred, by itself, it is not enough—especially if the surrounding circumstances undermine any claim of causation); Williams v. Serra Chevrolet Automotive, LLC, 4 F.Supp.3d 865, 879 (E.D.Mich.2014)(indicating that in light of Gross v. FBL Financial Services, Inc., 557 U.S. 167, (2009) and Univ. of Texas, 133 S.Ct. at 2517, temporal proximity alone is not enough to allow a reasonable inference of the but-for

Bonilla-Ramírez v. MVM, Inc., et al.
Civil No. 15-1586 (PAD)
Opinion and Order
Page 27

causation required to prevail in a retaliation action). And the uncontested factual circumstances here confirm that adequate proof of causality is lacking.

It is undisputed that COR Nuñez, who recommended plaintiff's removal from the contract, had no knowledge of plaintiff's EEOC Charge filing, for he recommended removing plaintiff from the ICE Contract *before* plaintiff filed the EEOC Charge. Further, Cuellar, the ICE official who decided to request the removal of plaintiff and two other individuals, did not know, at the time the determination was made and the request sent to MVM by email, of plaintiff's EEOC Charge. Plaintiff's and two other individual's performance and violation of the provisions of ICE's contract had been called into question by Nuñez and ICE *before* the EEOC Charge was filed. It is of no significance that the fax was sent to MVM the same day the removal order from ICE came as: (i) it is uncontested that the fax was addressed to Ms. Amanda Traeto who allegedly was MVM's "Human Resources Coordinator," not to McHale; and (ii) the fax is a general company fax, not one assigned to McHale, which he rarely if ever uses. In the same way, ICE instructed to remove plaintiff and two other individuals from working under the ICE contract and MVM was contractually obligated to take immediate action to remove these employees, according to the contract.

But even assuming temporal proximity sufficiently establishes a *prima facie* case of retaliation – a proposition for which there is no record support – plaintiff's retaliation claim would still fail. The reason is simple: MVM met its burden to establish a "legitimate, non-retaliatory" ground for the challenged decision: ICE's instruction to remove plaintiff and two other DO's from working under the Contract. As pointed out earlier, the ICE Contract requires MVM to "immediately remove an employee from duty if any disqualifying information concerning the

employee is received or confirmed by the COR or the government." SUMF ¶¶ 5-6. Thus, MVM

was contractually obligated to remove plaintiff from the ICE Contract upon ICE's request.

Moreover, the termination was consistent with ICE Minimum Standards of Conduct, which

regulated plaintiff's employment. Those Standards provide for the following disqualifying events,

requiring MVM "upon notification by the COTR, [to] immediately remove the employee for

removal from performing duties under the contract": (1) conducting personal affairs during official

time; (2) improper use of official authority or credentials; (3) violation of security procedures and

regulations. That plaintiff thinks that she did nothing wrong, does not alter this conclusion. And

as discussed above, the evidence is insufficient to support a finding of pretext.

### D. State Claims[35]

Plaintiff complains of gender discrimination in the modality of disparate treatment under

Law 100;[36] of having been unjustly discharged under Law 80; of retaliation under Law 115; and

of intentional infliction of emotional distress under Articles 1802 and 1803 (Docket No. 1 at ¶¶

---

[35] As the court noted in its previous Opinion and Order, it is unclear whether these claims were brought against all or some of the defendants.

[36] On the subject of Law 100 the Complaint states that plaintiff belonged to a protected class of employees, she was qualified for her job, *was forced to work in a hostile work environment* and to leave because of her employer's client's request and was substituted (Docket No. 1 at ¶ 57)(italics added). No factual elaboration was made on the elements of any such hostile work environment claim in connection with Law 100. Thus, MVM moved for summary judgment under Law 100, predicating its argument on the assumption that the claim was based on a theory of disparate treatment. See, Docket No. 72 at p. 27. Plaintiff opposed the motion, but did not raise any hostile work environment issue relevant to that statute. Instead, she focused her attention on the allegedly retaliatory termination after complaining about a hostile work environment and what she has characterized as the different treatment she received compared to male MVM employees. See, Docket No. 86 at pp.1, 6, 9. Therefore, any claim of hostile work environment under Law 100 is deemed waived. See, Steeves v. City of Rockland, 600 F.Supp.2d 143, 175 (D. Me. 2009)(holding that plaintiff had waived any claims against defendants in their individual capacities even though the complaint stated they were being sued in their individual capacities, where, in opposition to motion for summary judgment, she did not take issue with defendants' construction of the complaint as naming them only in their official capacities (citing, Grenier v. Cyanamid Plastics, Inc., 70 F.3d 667, 678 (1st Cir. 1995)); Rocafort v. IBM Corp., 334 F.3d 115, 122 (1st Cir. 2003)(passing reference to legal phrases and case citation without developed argument is not sufficient to defeat waiver"). If it were not waived, it would fail for the reasons stated in the discussion concerning the merits (as opposed to the failure to exhaust remedies) of the hostile work environment action under Title VII. See, Landrau v. Caribbean Restaurants, 14 F.Supp.2d 185, 193 (D.P.R. 1998)(dismissing hostile work environment claim under Puerto Rico law after dismissing corresponding claim under Title VII inasmuch as Federal and Puerto Rico laws on sexual harassment are closely aligned); Lee-Crespo, 231 F.Supp.2d at 429-430 & n.45 (same).

57, 63, 72, 82).  MVM moves to dismiss those claims as well (Docket No. 72 at pp. 13, 27-35).

The request stands unopposed.

### 1.  Law 100

As pointed out above, plaintiff lacks direct evidence of discrimination.  Nonetheless, she

may prove discrimination through a burden-shifting method centered on just cause.  To that end,

a plaintiff establishes a *prima facie* case of discrimination under Law No. 100 by demonstrating

that: (1) she suffered an adverse employment action; (2) the adverse action lacked just cause; and

(3) there exists some basic fact substantiating the type of discrimination alleged to have occurred.

See, Rodríguez v. Executive Airlines, ---F.Supp.3d----, 2016 WL 4640362, *3 (D.P.R. March 31,

2016)(setting forth elements of *prima facie* case).[37]  The *prima facie* case creates a rebuttable

presumption of discrimination.  See, Menzel v. Western Auto Supply Co., 848 F.2d 327, 331 (1st

Cir. 1988)(so holding).[38]

Once the presumption in activated, it shifts to the employer the burden of showing by a

preponderance of the evidence that the challenged action was not discriminatory.  See, De Arteaga,

862 F.2d at 941 (describing effect of presumption); Varela-Teron, 257 F.Supp.2d at 464

(same)(citing Ibañez-Benitez v. Molinos de P.R. Inc., 114 D.P.R. 42, 53 (1983)).  Should the

employer do so, the presumption disappears.  At that point, "the burden of persuasion shifts back

to the employee to demonstrate that the … [action] was motivated by discrimination." See, Hoyos

v. Telecorp Communications, Inc., 488 F.3d 1, 6 (1st Cir. 2007)(so stating); Hernández, 151 D.P.R.

---

[37] See also, Varela-Teron v. Banco Santander de Puerto Rico, 257 F.Supp.2d 454, 463, 466 (D.P.R. 2003)(discussing elements of *prima facie* case)(citing Díaz-Fontanez v. Wyndham Hotel, 155 D.P.R. 361 (2001)); Hernández v. Trans Oceanic Life Ins. Co., 151 D.P.R. 754, 775 (2000); and Belk Arce v. Martínez, 146 D.P.R. 215, 230-31 (1998).

[38] See also, Álvarez-Fonseca v. Pepsi Cola of Puerto Rico Bottling Co., 152 F.3d 17, 28 (1st Cir. 1998)(explaining that presumption of discrimination is triggered under Law No. 100 upon a showing that employer lacked just cause for the discharge or other adverse action taken against the employee).

754, 775 & n.9 (noting that once presumption disappears, employee may prevail with evidence showing existence of discrimination).

With this backdrop, subsequent to Álvarez-Fonseca a number of First Circuit opinions reflect a modified framework of plaintiff's initial burden under Law No. 100. As described in Cardona-Jiménez, 174 F.3d at 42, the employee's initial burden is to: (1) demonstrate that she was actually or constructively discharged; and (2) allege that the decision was discriminatory (citing Álvarez-Fonseca, 152 F.3d at 28).[39] But while the Court in Cardona-Jiménez referred to Law No. 100, it cited the portion of Álvarez-Fonseca referring to Law No. 80. See, Álvarez-Fonseca, 152 F.3d at 28. A sister court in this District so noted, pointing out that the citation refers to a *prima facie* case under Law No. 80, not Law No. 100. See, Varela-Teron, 257 F.Supp.2d at 464 (so noting).[40]

Not all post-Álvarez-Fonseca First Circuit cases, however, have adopted the Cardona reading of Álvarez-Fonseca. In Ramos v. Davis & Geck, Inc., 167 F.3d 727 (1st Cir. 1999), the First Circuit stated that under Law No. 100, "once the employee triggers the act's protections by showing that his discharge, constructive or otherwise, was not justified, the employee enjoys a presumption that he or she has been the victim of discrimination and the burdens of both production and persuasion shift to the employer." Id. at 734 (citing Álvarez-Fonseca, 152 F.3d at 27).[41] See

---

[39] See also, Hoyos, 488 F.3d at 6 (stating that employee alleging violation of Law 100 has the initial burden to establish *prima facie* case of discrimination by (1) demonstrating that he was actually or constructively discharged, and (2) alleging that the decision was discriminatory). If he employee satisfies this burden,

[40] An employee's initial burden under Law No. 80 is to allege unjustified dismissal and prove actual dismissal. Álvarez-Fonseca, 152 F.3d at 28. The burden of proof shifts to the employer, who must establish, by a preponderance of the evidence, that the discharge was justified. Id.

[41] This reading seems more consistent with the Supreme Court of Puerto Rico's description of plaintiff's initial burden under Law No. 100 as formulated in Díaz-Fontanez, 155 D.P.R. at 389 (noting the statutory presumption facilitates plaintiff's evidentiary burden if plaintiff establishes the basic elements triggering the presumption, in other words, that she was discharged without just cause and the discharge falls within the scope of the type of discrimination claimed), and in Hernández, 151 D.P.R. at 754, 775 (2000)(holding that employee shall begin presenting evidence showing a discharge or adverse action; absence of just cause; and some basic fact placing it within the modality of discrimination claimed).

also, Varela-Teron, 257 F.Supp.2d at 464 (recognizing consistency between the Ramos reading of

Álvarez-Fonseca and the Puerto Rico Supreme Court's description of a plaintiff's initial burden

under Law No. 100).[42]  On these formulations, plaintiff cannot prevail under Law 100.  As noted

below in connection with Law 80, the grounds upon which the employer acted qualify as just

cause; they are not anchored on plaintiff's gender; and the record does not show that plaintiff was

treated less favorably than similarly situated employees.

### 2.  Law 80

The statute makes certain employers liable for payment of an indemnity to employees hired

for undefined term who are dismissed without just cause.  See, Article 1 of Law 80, P.R. Laws

Ann. tit. 29 § 185a as amended by Article 4.3 of the Transformation and Labor Flexibility Act,

Law 4 of January 26, 2017 ("TLFA").  It contains a general definition of just cause, and provides

guidance on the application of this concept to various scenarios related to employee misconduct

and performance; reductions-in-force and shutdowns; and employee expressions in administrative,

judicial or legislative forums.  See, Article 2 of Law 80, P.R. Laws Ann. tit. 29 § 185b, as amended

by Article 4.4 of TLFA.  So construed, the term "just cause" includes: (1) grounds not motivated

by a legally prohibited reason when the discharge does not result from the mere whim of the

---

[42]  To the same effect, see, Rodríguez-Torres v. Caribbean Forms Manufacturer, Inc., 399 F.3d 52, 62 (1st Cir. 2005)(validating jury instruction to the effect that for burden of proof in a Law No. 100 claim to shift to employer, plaintiff had to prove that: she was in a protected class, was fired, and the termination was unjustified); Menzel, 848 F.2d at 331 (holding that "[i]f plaintiff fails to show that there was no just cause, the presumption of discrimination is not activated"); Salgado-Candelario v. Ericsson Caribbean, Inc., 614 F.Supp.2d 151, 176 (D.P.R. 2008)(holding that "[u]nder Law 100, plaintiff bears the initial burden of establishing: (1) that she suffered an adverse employment action; (2) that the adverse employment action was not justified; and 93) some basic fact substantiating the type of discrimination alleged"); Santiago-Rivera v. Johnson & Johnson, 436 F.Supp.2d 316, 325 (D.P.R. 2006)(noting that under Law No. 100 the employee has initial evidentiary burden to establish: "(1) that he or she suffered an adverse employment action, (2) that the adverse employment action was unjustified (not for good cause), and (3) some basic fact substantiating the type of discrimination alleged").

employer; and (2) reasons linked to the proper and normal operation of the establishment.  Id. at § 185b.  The concept is dynamic, and its application contextual.[43]

Plaintiff maintains she did not have a documented pattern of misconduct related to misuse of her Airport ID and there were no remarks of that sort on her 2013 evaluation (Docket No. 86 at p. 5).  She states that the incident, which she describes as "isolated," only warranted, if anything, retraining on the use of Airport IDs.  Id.  Statutory language in Law 80 references repeated offenses or violations.  See, Article 2 of Law 80, P.R. Laws Ann. tit. 29 § 185b, as amended by Article 4.4 of the Transformation and Labor Flexibility Act, Law 4 of January 26, 2017.  But this requirement should only be viewed as a general rule.  See, Jorge L. Capó-Matos, supra at p. 943 (so noting).  Just cause exists even in the case of a first violation or single offense when it is potentially damaging to the safety, order or efficiency in the proper and normal operations of the enterprise.  See, Torres Álvarez v. Centro de Patología Avanzada, 193 D.P.R. 920, 931-932 (2015) (recognizing principle).

Plaintiff incurred in a series of violations while performing her duties as a DO, including abandoning her post for approximately two hours to fraternize with an off-duty DO, using her personal cellular phone while on duty, and engaging in the serious security violation of piggybacking through airport security doors, all in violation of MVM's and ICE's Standards of Conduct, which plaintiff received and signed.  And ICE requested plaintiff's removal from the Contract.  It is apparent the discharge did not result from the mere whim of the employer or for legally prohibited reasons, but for reasons linked to the proper and normal operation of the establishment.  So the Law 80 claim must be dismissed.

---

[43] For a detailed and comprehensive discussion of this topic, see Jorge L. Capó-Matos, in M.J. Caterine (ed.), Employment at Will: A State-by-State Survey-Puerto Rico Chapter (2011), pp. 936-969 and 2014 Cumulative Supplement, at pp. 40-15 – 40-22.

### 3.  Law 115

Law 115 and Title VII are largely symmetrical is scope.  See, Vélez v. Janssen Ortho LLC, 467 F.3d 802, 809 (1st Cir. 2006)(so recognizing).  Because the retaliation claim under Title VII fails to survive summary judgment, the Law No. 115 action must be dismissed.  Id.  (dismissing Law 115 under similar circumstances).

### 4.  Articles 1802 and 1803

Article 1802 provides that a person who by an act or omission causes damages to another through fault or negligence shall repair the damage so done. P.R. Laws Ann. tit. 31 § 5141. Article 1803 applies the principle of *respondeat superior* to Article 1802 claims. Pagán-Cólon v. Walgreens of San Patricio, Inc., 697 F.3d 1, 16 (1st Cir. 2012).  Plaintiff's tort claims are essentially predicated on the discrimination and retaliation she has complained of, which in effect, places them beyond the purview of Articles 1802 and 1803.  To the extent a specific labor or employment statute has been enacted to cover the conduct for which a plaintiff seeks damages, it defines the scope of remedies available to redress the conduct complained of.  Santana-Cólon v. Houghton Mifflin Harcout Pub. Co., 81 F.Supp.3d 129 140-141 (D.P.R. 2014).

Originally, most employees hired for undefined term had no legal protection from wrongful discharge.  See Jorge L. Capó-Matos, supra, at pp. 932-936.  Article 302 of the Spanish Commerce Code, which continued in effect after Spain ceded its sovereignty over Puerto Rico in 1898 as part of the peace treaty to end the Spanish American War, provided that in case of employment relationships not subject to a fixed term, either party was free to terminate the relationship by giving a month's notice.  The merchant could provide payment of a month's salary in lieu of notice. But this provision only applied to employees subject to the Commerce Code.

The regime began to change in 1930, with the enactment of Law 43 of April 28, 1930, which added articles 1478 and 1479 to the Civil Code. Together, they provided that any employee of an industry or other lucrative business whose services was retained without a definite term and who was discharged without just cause without a fifteen-day prior notice, would be entitled to a payment equal to the salaries she would have earned during the regular pay period of not less than one week nor more than one month. Law No. 84 of May 12, 1943 amended Article 1478 of the Civil Code to eliminate the advance notice requirement previously established by Law No. 43.

In turn, Law No. 50 of April 20, 1949, repealed Articles 1478 and 1479 of the Civil Code, setting forth a separate wrongful discharge statute covering private sector employees hired for undefined term, including those subject to the Commerce Code. In addition, it provided that covered employees discharged without just cause would be entitled to one month's pay. Law No. 80 replaced Law No. 50 to, among other things, increase the amount of indemnity to be paid in the event of a dismissal without just cause. Like its statutory predecessors, it provides a remedy for unjust dismissal where the Civil Code provides none. For that reason, its remedial provisions have been considered exclusive to redress discharges without just cause of employees hired for an indefinite term. See, Weatherly v. International Paper Co., 648 F.Supp. 872, 877-878 (D.P.R. 1986) and cases cited therein.

When labor legislation has created new causes of action to regulate previously uncovered aspects of the employment relationship such as discrimination and retaliation, it has been subjected to the same remedial exclusivity principle barring redress under general statutes such as Article 1802 of the Civil Code. Santana-Colón, 81 F.Supp.3d at 140-141. And thus, remedies available to the employee for violation of labor/employment statutes will be the remedies established in the statute prohibiting the conduct complained of. Id. If the plaintiff cannot satisfy conditions

precedent to special statutory coverage set by the Legislature, she may not bypass the principle of remedial exclusivity invoking general statutes.[44]  Given that plaintiff seeks redress under Articles 1802 and 1803 for conduct covered by Title VII, Law No. 100 and Law 115, her claims under Articles 1802 and 1803 must be dismissed.

## IV.    CONCLUSION

In view of the foregoing, MVM's "Motion for Summary Judgment" (Docket No. 71) is GRANTED.  Plaintiff's claims of sex discrimination, hostile environment and retaliation under Title VII are DISMISSED; the discrimination, retaliation and unjust discharge claims under Law 100, Law 80 and Law 115 are DISMISSED; and the intentional infliction of emotional distress claim under Articles 1802 and 1803 of Puerto Rico Civil Code are DISMISSED.

**SO ORDERED**.

In San Juan, Puerto Rico, this 30th day of March, 2017.

s/Pedro A. Delgado-Hernández
PEDRO A. DELGADO-HERNÁNDEZ
United States District Judge

---

[44] See, Rivera-Almodóvar v. Instituto Socioeconómico Comunitario, Inc., 806 F.Supp.2d 503, 508 (D.P.R. 2011) (holding that "[b]ecause the provisions of the Civil Code are supplementary to special legislation, an employment discrimination plaintiff may pursue claims under Articles 1802 and 1803 only when they are based on tortious or negligent conduct distinct from that covered by the specific laws invoked, or which have an independent basis to support them"); Irizarry-Santiago v. Essilor Industries, et al., 982 F.Supp.2d 131 (D.P.R. 2013).